# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs February 5, 2014

## STATE OF TENNESSEE v. MICHAEL ANTHONY FOSTER

**Appeal from the Circuit Court for Madison County**
**No. 12-276    Roy B. Morgan, Jr., Judge**

---

**No. W2013-00558-CCA-R3-CD  -  Filed March 31, 2014**

---

The Defendant-Appellant, Michael Anthony Foster, was convicted by a Madison County Circuit Court jury of reckless endangerment and aggravated assault. The trial court merged the reckless endangerment conviction with the aggravated assault conviction and sentenced Foster to eight years in the Tennessee Department of Correction. On appeal, Foster argues that the evidence is insufficient to sustain his conviction for aggravated assault and that the trial court erred in denying alternative sentencing. Upon review, we affirm the judgment of the trial court but remand for entry of a corrected judgment showing that Foster was charged with and convicted of aggravated assault pursuant to Tennessee Code Annotated section 39-13-102(a)(1)(A)(iii), which is a Class C felony.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Daniel J. Taylor, Jackson, Tennessee, for the Defendant-Appellant, Michael Anthony Foster.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Senior Counsel; James G. Woodall, District Attorney General; and Rolf Hazlehurst, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### Trial

**State's Proof.** James Dawson, the victim, testified that on June 11, 2011, he finished work early and returned to his apartment, where he sat outside talking with his neighbors for several hours. During this time, the victim witnessed Foster and his friend Alvin arrive in

a truck. Around noon that day, he saw Foster fall down and hold onto a pole to steady himself, and one of his neighbors told him that Foster had been drinking all day.

The victim stated that Foster appeared to be less intoxicated as the day progressed. However, that afternoon, Foster exited his apartment and threatened to kill the victim, the other men present, and the landlord several times. The victim thought that Foster's behavior was funny because he knew that Foster had been drinking. He said that Foster's friend Alvin, who appeared sober, talked with the group outside while Foster rested for several hours in his apartment.

That night, it began to rain, and the victim informed Foster and Alvin that everyone had decided not to grill any food, and the two men invited him into Foster's apartment. The victim sat down in the chair that was the closest to the front door and talked to Alvin. During this time, Foster intermittently dozed and watched television.

The victim said that as he was about to leave, Foster got up and walked into the kitchen, which was just a few steps away. The victim and Alvin asked Foster what he was doing, and Foster returned with "two butcher knives" and said, "I told you I'm gonna kill y'all Mfer's." Foster then "struck out" and began chasing the victim and Alvin. The victim acknowledged that Foster was heavily intoxicated at the time but asserted that Foster was not so intoxicated that he could not catch him and stab him.

Alvin got out of the apartment first and outran the victim. When the victim exited Foster's apartment and ran past a plastic chair, he turned it over "to hopefully trip [Foster] up so [he] could get away from him[.]" Just after he turned over the chair, he felt the "12-inch long butcher knife" go into his back. The victim immediately felt "paralyzed" and fell down. While on the ground, he felt Foster pull the knife out of his back. The victim was unable to move his arms or legs so he "rolled over to see what as going on" and saw Foster trying to stab him in the chest.

The victim "started rolling as fast as [he] could out in the field to get away from [Foster]." He felt blood pouring out of him and "couldn't walk, couldn't get up, and [he] knew [he] was badly injured." He believed that Foster ran back to his house at that point. The victim said that he and Foster had never had any issues or arguments prior to Foster stabbing him.

The victim said Alvin returned, picked him up, and carried him to a neighbor's apartment. He denied telling Officer Travis that he was able to get up and run to a neighbor's house after being stabbed. The victim acknowledged that he drank three beers before the ambulance took him to the hospital. He said he underwent an operation for his

injuries and stayed in the intensive care unit for three weeks. He also said that his leg was paralyzed for six months and that he did not know if he would fully recover the use of his leg. The victim said he was "[e]motionally distraught" because there was "no reason at all for somebody to have to go through that."

Michael Revelle, an emergency room doctor at the Jackson-Madison County General Hospital, was declared an expert in the field of medicine. Dr. Revelle testified that on June 11, 2011, the victim was admitted in stable condition with serious injuries after being stabbed. He examined the victim in the emergency room and saw that he had "sustained a stab wound to his back [and was] bleeding from that area at the time. Dr. Revelle stated that stab wound was an inch wide but that the wound was deep enough to puncture Dawson's lung. Based on a chest x-ray, Dr. Revelle determined that forty percent of Dawson's lung had collapsed. He inserted a chest tube 'to drain the blood and air out of . . . the chest space between his lung and the chest wall." Dr. Revelle asserted that the victim's injuries carried a substantial risk of death and asserted that if he had not "placed the chest tube or evacuated the area, [the victim] could have potentially died from [the] collapsed lung[.]"

David Travis, a deputy with the Madison County Sheriff's Office, testified that he investigated the crime involving the victim. When he arrived at the crime scene, another officer told him that the victim had identified Foster as the person who stabbed him in the parking lot of the apartment complex and that the victim was on his way to the hospital. Deputy Travis collected two knives from the crime scene and noted that one of the knives, the serrated one, had fresh "drops of water" on it. In addition, he collected a wet washcloth, a bed sheet with suspicious stains near the pillow area, and the victim's bloody shirt. He stated that the victim's shirt "had a hole in the upper right shoulder that was consistent with a stab wound."

Deputy Travis later spoke with the victim, who informed him that Foster was so intoxicated that he could not stand upright the day of the offense. The victim told him that Foster had tried to get other men to fight him several times that day but that everyone laughed at him and refused. He said he never wrote in his report that the victim told him that Foster had threatened to kill him; however, he acknowledged that the victim had asserted in his own written statement that Foster had threatened to kill him. He also acknowledged that the victim said Foster had been drinking vodka and taking pills since 7:00 a.m. that day. The victim told Deputy Travis that he went into Foster's apartment and that Foster got up and pulled out the knives. However, the victim told him that he was able to get his cigarettes as he was leaving Foster's apartment. The victim also told him that after the stabbing he was able to roll away and that Foster was unable to catch him because he was too intoxicated. The victim told him that he was able to run to a neighbor's apartment after the stabbing to call 9-1-1 and never mentioned that he had to be carried to the neighbor's apartment.

Deputy Travis said that he did not interview Foster the night of the stabbing because other officers told him that Foster "was very intoxicated," and he it felt it was best to "wait until he sobered up before [he] spoke to him." When Deputy Travis conducted the interview the next day, Foster said that the only thing he remembered from the previous night was that he had been "drinking quite heavily." Foster told him that he had bought "a gallon of vodka" prior to the stabbing and had consumed most of it. He said "he needed to stop drinking because he [got] stupid when he [drank]." When Deputy Travis told Foster that he had been accused of stabbing his neighbor, the victim, Foster stated that

> he had been with another gentleman named Alvin . . . [and] they had gone to a store and picked up liquor in the afternoon . . . and that they had returned back to his apartment. He . . . remember[ed] having [the victim] in his apartment that night . . . . He advised he did remember picking up two knives out of the cutlery block, and he said he remembered . . . the Alvin gentleman telling him to chill out, and he didn't remember anything after that.

Deputy Travis stated that although Foster did not appear to be sick from drinking too much the day before, he was confused about what had happened the previous night.

**Defense Proof.** Holly Sanders, Foster's daughter, testified that on June 11, 2011, she went to her father's apartment complex to "check on" him between 5:15 and 5:30 p.m. She saw that her father was "leaned back in his van" and he and Alvin "were just sitting there." Sanders said that when her father got out of the van, he appeared to be heavily intoxicated because he "stumbled getting out of the van" and "was staggering as he was walking." She also said her father's words were "really slurred," and she could "barely understand what he was saying to [her]."

Sanders eventually learned that her father had been arrested, and she returned to his apartment the next morning because someone had told her that her father's apartment was unlocked. She said that her father's things were everywhere and that some of his belongings had been stolen. She also saw a "bigger bottle" of vodka on the table that was nearly empty. Sanders stated that when she was a child, her father would often "sleepwalk" and then awaken and be startled. She said her father also had issues with depression.

Jonathan Lipman, a forensic examiner for Neuroscience Consulting, was declared an expert in the field of neuropharmacology. Dr. Lipman testified that he reviewed police records, witnesses' statements, officers' reports, Foster's medical records and drug rehabilitation records and interviewed Foster to determine Foster's approximate blood alcohol level at the time of the offense. Dr. Lipman stated that he assumed that Foster drank 1.75 liters of 80 proof vodka to hypothesize how Foster's body processed this alcohol. He

-4-

said Foster told him he drank all of the bottle of vodka he purchased and that this was not the first time he had drunk an entire bottle. He considered Foster's history of "severe binge drinking [and how it] affects change in the biochemistry of the liver and the brain and behavior." Based on his assumptions and calculations, Dr. Lipman opined that Foster's blood alcohol concentration at the time of the offense was .358 grams percent, .358 milligram per deciliter, which "is on the scale that .08 is DUI." He said that meant that Foster was "seriously, seriously intoxicated."

Dr. Lipman stated that this blood alcohol level would cause a normal person to be comatose because such a level was "not far from the lethal concentration for an alcohol naive person, which is about [.]500 milligram per deciliter." However, he stated that chronic alcoholics "learn over time to tolerate higher than normal alcohol concentrations." He added, "Numbers like [.]358 milligram per deciliter are actually not that unusual in chronic alcoholics who are seriously intoxicated, typically at the moment of arrest[.]" Dr. Lipman acknowledged that there was no blood sample for him to examine from Foster but asserted that his calculation was a conservative one, meaning that he had underestimated Foster's blood alcohol concentration.

Dr. Lipman stated that with high blood alcohol levels, "[j]udgment is the first thing to be impaired [and this] actually happens at quite lower levels." In addition, a person's "ability to monitor their own emotions becomes impaired at a somewhat higher concentration." He explained that if a person was unable to walk without falling, then all the higher parts of the brain stem would have been impaired. He said that a person with a blood alcohol concentration of .35 grams percent, as he had calculated for Foster, would have lost all of these abilities.

Dr. Lipman also stated that alcohol negatively affects a person's ability to remember events. He explained that during an alcohol blackout "[t]he person is not unconscious at the time. They are doing things. The brain isn't fully function[ing], and they later will not remember having done [those things]. It's really a characteristic of alcoholism[.]" He stated that there are two different ways that memories are recorded during alcohol blackouts: (1) patchy recollection, in which the person remembers events to a certain point in time and then does not remember anything beyond that point, and (2) confabulations, in which the person remembers something they did the week before and it "intrudes into that space" and the person believes that is what they did.

Dr. Lipman asserted that there are two common sleep disorders: (1) rapid eye movement behavior disorder, which occurs when a person moves and acts out in REM sleep, and (2) non-REM arousal, which occurs in the early stages of sleep when the muscles are not "turned off." Dr. Lipman said that an individual with a non-REM arousal disorder can "be

combative and disorganized and confused[.]" In addition, he stated that individuals who sleepwalk do not know they are performing a task until they "awaken and realize what they are doing." Dr. Lipman stated that high blood alcohol levels are "a recognized trigger to confusional arousal" which is a "form of altered consciousness" where individuals within the first hour or two of sleep can have "agitated or confused behavior."

On cross-examination, Dr. Lipman acknowledged that he had been appointed to assist Foster's attorney. He said the work he did in this case was based upon his assumptions that Foster bought a 1.75 liter bottle of vodka, that Foster drank the entire bottle with the exception of the small amount that his daughter saw in the bottle the next morning, and that Foster did not vomit any of the alcohol prior to committing the offense in this case. He also stated that he assumed the point in time when Foster began drinking and the rate at which he continued to drink. Dr. Lipman acknowledged that if any of his assumptions were untrue, it would affect his calculation as to Foster's blood alcohol content. He acknowledged that a person who was substantially impaired would have trouble catching a victim and stabbing them in the back.

On redirect examination, Dr. Lipman stated that he reviewed the victim's version of the events and heard his testimony at trial and asserted that the victim's statements in the courtroom were "[d]ramatically different" from his earlier statements.

On recross-examination, Dr. Lipman asserted that the victim's testimony at trial that he was stabbed in the back while running was different from his prior statement that he threw a chair in Foster's path, which caused the victim to trip and fall, and Foster tried to stab him in the chest but he flipped over in an attempt to get up, and Foster stabbed him in the back. He also stated that the victim's testimony at trial was that Foster was extremely intoxicated earlier in the day and was not very intoxicated prior to the stabbing incident while the victim's statement indicated that Foster was so intoxicated when he woke up in the apartment that Alvin tried to hold him up so he would not fall. Dr. Lipman acknowledged that much of the victim's testimony about Foster trying to start fights with him and threatening him was consistent with his prior written statement.

Scott Cornelison, another deputy, testified that he was the second officer to respond to the crime scene. He spoke with the victim and prepared a report, which stated that the victim told him he had fallen to the ground and then Foster jumped on his back or fell on him and stabbed him with the knife. The victim also told him that he picked up a plastic chair and hit Foster with it. Deputy Cornelison said that he observed Foster at the scene and although Foster was not extremely unsteady on his feet, he "was pretty intoxicated." He did not take a statement from Foster at the scene.

-6-

Foster, the Defendant-Appellant, testified that he lived alone at the Northside Motel. On June 11, 2011, he left work at 9:00 a.m. and bought "a half a gallon" of vodka at a liquor store and bought some grapefruit juice at a grocery store. When he got home, he mixed the vodka with the grapefruit juice and began drinking at 10:00 or 11:00 a.m. He identified a photograph taken of his apartment depicting the mug he had been drinking from that day, which still contained some vodka and grapefruit juice. He said he continued "drinking all day" and was unsure when Alvin got to his apartment complex. He acknowledged that he became intoxicated after drinking "a lot of" the vodka he purchased. Foster admitted that this incident was not the first time that he had drunk nearly an entire large bottle of vodka but asserted that he usually drank "maybe half [of a large bottle] in one day."

Foster stated that he did not remember "a lot" of what happened on June 11, 2011. He acknowledged that he had never argued with the victim before the day of the incident. Foster did not see the victim when he got back to his home from the grocery store. He remembered seeing his daughter the afternoon of June 11, 2011, but did not recall seeing or threatening the victim during that time period. Foster said he remembered seeing the victim "sitting and leaning up against [his] dresser" in his apartment when he awoke after passing out. He said he vaguely "remember[ed] something about some knives[.]" Foster said he did not recall chasing or stabbing the victim with a knife. He asserted that the only thing he remembered from the incident was awakening and seeing the victim. He said he also "remember[ed] some knives, but [he did not] know what time of day it was." Foster said he did not remember doing anything with the knives but did recall Alvin saying, "Chill out, chill out," although he was unsure what time Alvin told him this. He did not remember what happened after Alvin told him to "chill out," but he knew he was still heavily intoxicated at that point.

Foster stated that he remembered when the police arrived because he was asleep in his bed when they began banging on his door. The officers took him outside. At the time, he had sobered up "a little bit" but was still feeling the effects of the vodka. The next morning Foster agreed to talk to the officers. He told them about the vodka he had drunk and what he could remember about the previous night.

Foster said that he did not plan to hurt the victim and that he could not think of any reason he would want to stab the victim. He did not remember stabbing the victim and did not recall the victim hitting him with a chair. He asserted that he had issues with "sleepwalking every now and then." Foster said he would realize that he had been sleepwalking when he "w[o]ke up outside, [and] the door [was] open." There were also times when he had awoken to find urine on the floor even though he did not remember using the bathroom. He said he would sleepwalk when he did not drink alcohol but he "[did]n't guess" he would sleepwalk after consuming alcohol. Foster said that he had not "drunk a drop" of

alcohol since the incident and had received treatment for alcohol abuse. He admitted that he was voluntarily intoxicated on June 11, 2011, when he stabbed the victim. He did not remember telling the victim that he was going to kill him.

**Sentencing Hearing**

James Dawson, the victim, testified that Foster's offense of stabbing him had been "really hard on [him] and [his] family financially, physically, [and] emotionally[.]" He stated that following the stabbing, it took him seven months to learn how to walk again. He had to move in with his family because he was bedridden for six months after the incident and had difficulty finding work after that time. The victim stated that his injuries had affected his ability to do certain jobs that required physical strength. He said he received $12,000 to $15,000 to cover some of his medical bills and received $11,000 to cover his lost wages during his recovery period from the Criminal Injury Compensation Claim Fund. The victim stated that much of the money he received went to pay his child support arrearage that had accrued following his injury. He said he felt Foster should be required to serve the maximum sentence in prison for his crime because he had nearly lost his life.

Gayle McCord, Foster's sister, testified that Foster had a strong work ethic. McCord stated that Foster had three children and that Foster had witnessed one of his children die when the bike the child was riding was hit by an automobile. She stated that since his child's death, Foster sometimes tried to "escape through alcohol and maybe drugs." She also stated that Foster had "bouts of depression and guilt and remorse." She was really surprised when she heard that Foster had been arrested for stabbing the victim because Foster was not a violent person and "drinking [was] an escape for him to not feel so much pain." She stated that since this incident, her brother had received alcohol abuse counseling at Pathways, where he was diagnosed with depression. She also stated that her brother received outpatient treatment for six months. McCord stated that since this incident Foster was working, surrounding himself with family, and not drinking. She also said he was remorseful for injuring the victim. McCord asked that the court allow her brother to serve his sentence on probation so that he could receive counseling and make his own choices every day.

Dean Foster, the Defendant-Appellant's brother, testified that his brother had worked for him for years before he began working on his own. He said his brother was "[v]ery dependable" and did "quality work." He stated that he "was shocked" when he learned that his brother had been arrested for stabbing a man because his brother was not a violent person. Dean Foster said that after the incident, his brother said he was never going to drink again and, to his knowledge, had not had anything to drink. He said his brother was very remorseful for hurting the victim, even though he did not remember what happened or how it happened because of his intoxication. He also said that his brother had been doing well

-8-

since participating in the Pathways counseling program. Finally, he asked that his brother receive a sentence of probation so that he could continue to work and be a productive person.

Foster, the Defendant-Appellant made the following statement of allocution: "I'd just like to apologize to [the victim] for what happened. I never did mean it to happen. And [as] far as drinking, I'm on a new path now. I'm feeling better. My head's clearer. I don't drink no more, and I just wish none of this ever happened. I'm sorry it did. Thank you."

## ANALYSIS

**I. Sufficiency of the Evidence.** Foster argues that the evidence was insufficient to sustain his conviction for aggravated assault. Specifically, he contends that his voluntary intoxication prevented him from intentionally or knowingly committing the offense in this case. Because a reasonable jury could have found that Foster knowingly or intentionally committed the offense of aggravated assault, we conclude that the evidence was sufficient to support his conviction.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption

of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

As charged in this case, a person commits the offense of aggravated assault who intentionally or knowingly causes bodily injury to another and uses or displays a deadly weapon. T.C.A. § 39-13-102(a)(1)(A)(iii). A person acts "intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Id. § 39-11-302(a). A person acts "knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Id. § 39-11-302(b); see State v. Szumanski Stroud, No. W2006-01945-CCA-R3-CD, 2007 WL 3171158, at *5 (Tenn. Crim. App. Oct. 29, 2007) (concluding that the offense of aggravated assault committed by intentionally or knowingly using or displaying a deadly weapon is a "nature of conduct" offense).

Foster asserts that his voluntary intoxication prevented him from intentionally or knowingly committing the offense in this case. Although not a defense to prosecution, voluntary intoxication "is admissible in evidence, if it is relevant to negate a culpable mental state." T.C.A. § 39-11-503(a); see Wiley v. State, 183 S.W.3d 317, 333 (Tenn. 2006) ("Evidence of a defendant's intoxication is relevant to negate a culpable mental state of a charged offense."). "Proof of voluntary intoxication is therefore akin to proof of a mental disease or defect that prevents a defendant from forming the culpable mental state required for the offense under consideration." State v. Hatcher, 310 S.W.3d 788, 814 (Tenn. 2010). However, "[p]roof of intoxication alone is not a defense to a charge of committing a specific intent crime nor does it entitle an accused to jury instructions as requested . . . ; there must be evidence that the intoxication deprived the accused of the mental capacity to form specific intent." Harrell v. State, 593 S.W.2d 664, 672 (Tenn. Crim. App. 1979). Typically, as in Foster's case, this evidence is introduced through an expert who testifies that the defendant was incapable of forming a criminal intent because of his or her voluntary intoxication. State v. Adams, 405 S.W.3d 641, 660-61 (Tenn. 2013). The weight given to evidence of voluntary intoxication and the determination of whether the voluntary intoxication negated the culpable mental state are matters resolved by the jury. State v. Morris, 24 S.W.3d 788, 796 (Tenn. 2000).

The record shows that the jury was properly instructed on voluntary intoxication at trial. Although Foster contends that his voluntary intoxication negated the specific intent required for the aggravated assault offense, the jury rejected this claim. The victim testified that Foster was extremely intoxicated early in the day on June 11, 2011. However, as the day continued, Foster appeared to be less intoxicated because he rested in his apartment for several hours and began walking in and out of his apartment. In the afternoon, just prior to

the stabbing, the victim stated that Foster invited him inside his apartment, where Foster intermittently dozed while watching television. He said Foster woke up, went into the kitchen, retrieved two butcher knives, and threatened to kill him. Foster then chased the victim and stabbed him in the back as he overturned a chair in an attempt to escape. Deputy Travis testified that Foster informed him that he remembered seeing the victim in his apartment that night, picking up two knives out of the cutlery block, and hearing his friend Alvin tell him to chill out. Dr. Lipman, Foster's expert, testified that individuals having an "alcoholic blackout" are conscious of their actions at the time, but their actions are not being recorded in their memory. Based on the proof presented at trial, a reasonable jury could have found that Foster either had a conscious desire to stab the victim or was aware that he was stabbing the victim, even if the amount of the alcohol he ingested prevented him from recalling his actions at a later point in time. Therefore, we conclude that there is sufficient evidence to sustain Foster's aggravated assault conviction beyond a reasonable doubt.

**II. Excessive Sentence.** Foster also argues that the trial court abused its discretion in denying his request for an alternative sentence. Although he concedes that his eight-year sentence is within the proper sentencing range, he argues that his sentence does not comply with the purposes and principles of the sentencing act. First, he claims that the trial court did not fully consider the factors in Tennessee Code Annotated sections 40-35-210(a), (b) and 40-35-103(5). Second, he argues that the trial court failed to determine the weight given to specific mitigating factors and failed to "explain the method by which [the enhancement factors] were evaluated and balanced to determine the sentence." Finally, he argues that he was a favorable candidate for alternative sentencing, that he did not have a long history of criminal conduct, and that measures less restrictive than confinement had not been frequently or recently been applied unsuccessfully to him. Although the court found that confinement was necessary to avoid depreciating the seriousness of the offense and that confinement was particularly suited to provide an effective deterrence to others likely to commit similar offenses, he claims this confinement factor could be applied to any aggravated assault offense resulting in injury and asserts that the trial court failed to make adequate findings as to why this confinement factor applied.

At the conclusion of the sentencing hearing, the trial court stated that it considered the entire record in this case prior to imposing a sentence. Specifically, the court said that it considered the sentencing guidelines in Code section 40-35-103, "the exhibits, the testimony today, the presentence report, et cetera." The court applied the "catch-all" mitigating factor based on the "defendant's age, employment history, his prior history with depression and stress disorders, [and] the letters [from] various individuals, including family members." See T.C.A. § 40-35-113(13).

The court noted that the jury considered evidence of Foster's intoxication during the offense as well as the testimony from Dr. Lipman in choosing to convict him in count one of the lesser included offense of reckless endangerment rather than the charged offense of attempted premeditated murder. It noted that Foster's criminal history, other than his two felony convictions for burglary, included mostly "minor offenses." Because these two felony convictions were used to sentence Foster as a Range II, multiple offender, the court declined to consider these felony convictions as a way to further enhance Foster's sentence. However, the court applied the enhancement factor that Foster had "no hesitation about committing a crime when the risk to human life was high[.]" See id. § 40-35-114(10).

The court noted that the victim suffered a serious injury in this case:

"[T]his was a very serious injury as far as that stab wound, with the serrated edge knife . . . to the back of the victim. . . . This could have been very devastating in the sense that a life could have been lost. It was not [lost,] but serious injury [occurred], and Dr. Revelle testified to the extent of that injury of what could have happened, and I've taken that into consideration, as well as all the testimony given during the trial in trying to determine what would be a fair sentence."

The trial court merged the conviction for reckless endangerment with the conviction for aggravated assault and sentenced Foster as a Range II, multiple offender to an eight-year sentence. In determining the manner of service of this sentence, the court noted that although Foster did not have a long history of criminal conduct for the purposes of Tennessee Code Annotated section 40-35-103(1)(A), he did "have a prior history, and this is his first act of actual violence, but when he drinks, he certainly can become violent if he were to start drinking again. He's evidenced that." The court, however, did find that "confinement [was] necessary to avoid depreciating the seriousness of the offense and to affect a deterrence to others under similar circumstances." See id. § 40-35-103(1)(B). Regarding this confinement factor, the court stated, "It's a very serious situation, and not to impose [a] sentence to be served I think would take away from the seriousness of it, again the stabbing [of the victim] in the back with the knife under these circumstances." Consequently, the court ordered Foster to serve his eight-year sentence in the Tennessee Department of Correction but made the recommendation that he be placed in the special needs section of the prison in light of his history of depression and alcohol abuse.

We note that the 2005 amendments to the sentencing act "served to increase the discretionary authority of trial courts in sentencing." State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In light of this broader discretion, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating

factors, have been properly addressed." Id. at 706. Therefore, this court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. This abuse of discretion standard of review also applies to a trial court's decision regarding "probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012).

Pursuant to the 2005 amendments to the sentencing act, a trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d), Sentencing Comm'n Comments. In determining the proper sentence, the trial court must consider the defendant's potential for rehabilitation or treatment. Id. §§ 40-35-102, -103. In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. §§ 40-35-103(2), (4).

Any sentence that does not involve complete confinement is an alternative sentence. See generally State v. Fields, 40 S.W.3d 435 (Tenn. 2001). Tennessee Code Annotated section 40-35-102(6)(A) states that a defendant who does not require confinement under subsection (5) and "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.]" However, a trial court "shall consider, but is not bound by, the advisory sentencing guideline" in section 40-35-102(6)(A). Id. § 40-35-102(6)(D). In determining whether to deny alternative sentencing and impose a sentence of total confinement, the trial court must consider if:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Id. § 40-35-103(1)(A)-(C); see State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

We note that the trial court's determination of whether the defendant is entitled to an alternative sentence and whether the defendant is a suitable candidate for full probation are different inquiries with different burdens of proof. State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). The defendant has the burden of establishing suitability for full probation, even if the defendant is considered a favorable candidate for alternative sentencing. See id. (citing T.C.A. § 40-35-303(b)).

Foster was eligible for probation because his sentence was ten years or less and the offense for which he was sentenced, aggravated assault, is not specifically excluded by statute. T.C.A. § 40-35-303(a). The trial court shall automatically consider probation as a sentencing alternative for eligible defendants; however, the defendant bears the burden of proving his or her suitability for probation. Id. § 40-35-303(b). In addition, "the defendant is not automatically entitled to probation as a matter of law." Id. § 40-35-303(b), Sentencing Comm'n Comments. Rather, the defendant must demonstrate that probation would serve "the ends of justice and the best interests of both the public and the defendant." State v. Souder, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (citations omitted).

Despite Foster's claims to the contrary, the record shows that the trial court fully considered the factors in Tennessee Code Annotated sections 40-35-210(a), (b). In addition, regarding his claim that the trial court failed to consider the sentencing principle in Code section 40-35-103(5), we note that although the court recognized Foster's progress in seeking rehabilitation for his alcohol abuse, it felt the seriousness of his offense required a sentence of confinement. Moreover, although Foster argues that the trial court failed to determine the weight given to specific mitigating factors and failed to "explain the method by which [the enhancement and mitigating factors] were evaluated and balanced to determine the sentence, we note that a trial court's "fail[ure] to appropriately adjust" a sentence in light of applicable, but merely advisory mitigating or enhancement factors, is no longer a ground for reversal under the amended sentencing act. State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008).

Finally, Foster argues that he should have received an alternative sentence because he was a favorable candidate for alternative sentencing, because he did not have a long history of criminal conduct, and because measures less restrictive than confinement had not been frequently or recently been applied unsuccessfully to him. We note that although Foster was convicted of aggravated assault, a Class C felony, he was not considered a favorable candidate for alternative sentencing because he was a Range II, multiple offender rather than a standard or mitigated offender. See T.C.A. § 40-35-102(6)(A). The record shows that the trial court properly determined that confinement was necessary to avoid depreciating the seriousness of the offense. See id. § 40-35-103(1)(B). Although Foster claims this confinement factor could be applied to any aggravated assault offense resulting in injury and that the trial court failed to make adequate findings as to why this confinement factor applied, we disagree. The record shows that the trial court made more than sufficient findings regarding the seriousness of the offense, particularly when it noted that the victim's injuries "could have been very devastating in the sense that a life could have been lost."

Because the record shows that the trial court carefully considered the evidence, the enhancement and mitigating factors, and the purposes and principles of sentencing prior to imposing a sentence of confinement, Foster has failed "to either establish an abuse of discretion or otherwise overcome the presumption of reasonableness afforded sentences which reflect a proper application of the purposes and principles of our statutory scheme." Caudle, 388 S.W.3d at 280. The judgment of the trial court is affirmed. However, because the indictment charged Foster in count 2 with aggravated assault pursuant to Tennessee Code Annotated section 39-13-102(a)(1)(A)(iii), we remand for entry of a corrected judgment showing that Foster was charged with and convicted of a Class C felony, rather than a Class D felony. See T.C.A. § 39-13-102(e)(1)(A)(ii).

## CONCLUSION

The judgment of the trial court is affirmed but the case is remanded for entry of a corrected judgment showing that Foster was charged with and convicted of a Class C felony, rather than a Class D felony.

_____
CAMILLE R. McMULLEN, JUDGE